UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COGNITIVE EDGE PTE LTD., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:19-cv-12123-IT |
| | * | |
| CODE GENESYS, LLC, SPRYNG.IO, | * | |
| LLC, SPRYNG.IO | * | |
| ANTHROCOMPLEXITY, LLC, and | * | |
| SPRYNG.IO EU LTD., | * | |
| | * | |
| Defendants. | * | |

**Findings of Fact and Conclusions of Law**

January 19, 2021

**TALWANI, D.J.**

I.    Introduction

        In this action, Plaintiff Cognitive Edge Pte Ltd. ("Cognitive Edge") alleges that Defendants

Code Genesys, LLC ("Code Genesys"), Spryng.io Anthrocomplexity, LLC, Spryng.io, LLC, and

Spryng.io EU Ltd. (collectively "Defendants") breached a settlement agreement and the implied

covenant of good faith and fair dealing. Amended Complaint ("Am. Compl.") [#26]. Cognitive

Edge alleges further that Defendants engaged in unfair and deceptive practices in violation of

M.G.L. c. 93A and false advertising in violation of the Lanham Act. Am. Compl. [#26]. The

action having been tried on the facts without a jury, see Elec. Clerk's Notes [#75], the court's

findings of fact and conclusions of law are as follows.

II.    Findings of Fact

    A.    The Parties and their Prior Relationship

        Plaintiff Cognitive Edge is a Singapore-based "software and methods company" that sells

a product called SenseMaker. Trial Transcript ("Tr.") 8 [#78]. Plaintiff holds certain patents relating to that product, and David Snowden, one of the company's founders and its Chief Scientific Officer ("CSO"), was responsible for obtaining those patents. Tr. 8, 30.

Defendant Code Genesys is a software and consulting company. Tr. 56. Spryng.io, LLC, Spryng.io Anthrocomplexity, LLC, and Spryng.io EU Ltd. are "holding companies for [Code Genesys's] investors." Tr. 57.

"In 2018, Cognitive Edge and Code Genesys entered into an agreement to facilitate a potential combination of the two companies and the development of a prototype software platform called 'MassSense.' As part of this development process, Cognitive Edge made its SenseMaker source code available to Code Genesys as well as other proprietary documents and concepts which Cognitive [Edge] intended to implement in a more advanced version of SenseMaker." Am. Compl. ¶ 11 [#26]; see also Answer ¶ 11 [#32] (admitting).

Cognitive Edge and Code Genesys ultimately did not combine. See Tr. 10. Nonetheless, the MassSense source code became embedded in the Spryng.io software platform operated by the four Defendants. Tr. 11-12; 58; 65-66 ("MassSense was rolled into Spryng.io . . ."). Prospective customers of Spryng.io who were familiar with the prior relationship between Cognitive Edge and Code Genesys subsequently expressed concerns to Defendants' CEO Ajay Reddy that Defendants did not have rights to use or market Spryng.io and that users of the product may be subject to potential liability for doing so. Tr. 128-29, 131-32; see also Tr. 117-18; Tr. 145 (prospective customers had questioned "whether or not even engaging in any kind of a sense-making process outside of the Cognitive Edge realm presented potential legal liabilities because of the…patents issue.").

B. The Prior Lawsuit

Code Genesys filed suit against Cognitive Edge (henceforth referred to as "the Prior Lawsuit"). See Complaint [#1], Code Genesys, LLC v. Cognitive Edge Pte Ltd., No. 1:18-cv-12509-IT (D. Mass. Dec. 6, 2018). Count 5 of the Amended Complaint in that suit sought, inter alia, a declaration "that [Code Genesys]'s Spryng.io software is wholly the property of Code Genesys," that "the Sprying.io software does not incorporate any proprietary trade secrets of [Cognitive Edge]" and that "the Sprying.io software is not subject to any co-venture rights, co-ownership, or cross-licensing rights with Cognitive Edge." Amended Complaint ¶ 60 [#58], Code Genesys, LLC v. Cognitive Edge Pte Ltd., No. 1:18-cv-12509-IT (D. Mass. Sept. 9, 2019). Cognitive Edge brought counterclaims including claims for Misappropriation of Trade Secrets. Amended Answer, Affirmative Defenses, and Amended Counterclaims [#83], Code Genesys, LLC v. Cognitive Edge Pte Ltd., No. 1:18-cv-12509-IT (D. Mass. Oct. 4, 2019).

The Prior Lawsuit was set for an October 7, 2019 bench trial. However, at 10:30 p.m. on the night before trial, Code Genesys filed an Emergency Motion to Amend the Complaint [#85], seeking to bring a claim for breach of a settlement agreement purportedly reached a day earlier. Code Genesys, LLC v. Cognitive Edge Pte Ltd., No. 1:18-cv-12509-IT (D. Mass. Oct. 6, 2019). On the morning of October 7, 2019, Ajay Reddy, the CEO of Code Genesys and the co-Defendants here, Tr. 57-58, and Jack Speranza, who at the time was the Chief Operating Officer for Code Genesys and currently assists Mr. Reddy as a consultant, Tr. 29, 58, 107, were both present in the courtroom. Tr. 13-14, 108.[1] David Snowden of Cognitive Edge was also present.

---

[1] Mr. Speranza previously spent approximately ten years in private practice as an attorney working on insurance-related litigation, insurance coverage issues, and general business during which time he had occasion to be involved in the drafting of numerous settlement agreements. Tr. 106-07.

Tr. 13-14, 108. The court heard argument on the emergency motion, and then heard testimony from Cognitive Edge's counsel and admitted documentary evidence only as to "the threshold issue of whether a settlement had been reached," and specifically "whether there was a meeting of the minds sufficient to form a settlement agreement." Electronic Clerk's Notes [#88], <u>Code Genesys, LLC v. Cognitive Edge Pte Ltd.</u>, No. 1:18-cv-12509-IT (D. Mass. Oct. 7, 2019) (as modified Nov. 6, 2019). After the parties indicated interest in adjournment to discuss settlement, the court adjourned the proceedings without making any findings. <u>Id.</u>; Tr. 14.

After the recess, counsel reported to the court that the matter had settled. Electronic Clerk's Notes [#88], <u>Code Genesys, LLC v. Cognitive Edge Pte Ltd.</u>, No. 1:18-cv-12509-IT (D. Mass. Oct. 7, 2019). A <u>Joint Stipulation of Dismissal</u> [#89] was filed in open court. <u>Code Genesys, LLC v. Cognitive Edge Pte Ltd.</u>, No. 1:18-cv-12509-IT (D. Mass. Oct. 7, 2019).

C. <u>The Settlement Agreement</u>

To settle the Prior Lawsuit, <u>see</u> Tr. 14, 108, Cognitive Edge and Code Genesys, as well as Spryng.io, LLC, Spryng.io Anthrocomplexity, LLC, and Spryng.io EU Ltd., entered into a Memorandum of Understanding Concerning Litigation Settlement, Licensing and Confidentiality (the "Settlement Agreement").[2] Trial Exhibit ("Tr. Exh.") 1. As Defendants concede, no portion of the Settlement Agreement "confers full ownership rights of the Spryng.io Platform" on any party. <u>See</u> Tr. 63 (testimony of Ajay Reddy).

---

[2] As articulated in the Settlement Agreement's Preamble:

> WHEREAS, Code Genesys filed a complaint in the United States District Court for the District of Massachusetts captioned <u>Code Genesy, LLC v. Cognitive Edge Pte Ltd</u>, Case No. 1:18-cv-12509-IT ("the Action"); and WHEREAS, the Parties desire to (a) settle and resolve all differences and disputes that exist or may exist between them relating to the Action and/or the subject matter thereof, (b) enter into this Memorandum of Understanding for purposes of settlement and compromise, and (c) avoid further costs of litigation.

The first two paragraphs of the Settlement Agreement contain mutual releases of all claims "[e]xcept for the obligations established in" the Settlement Agreement. Tr. Exh. 1. The third paragraph requires the parties to file a joint stipulation of dismissal of the Prior Lawsuit, which they did. Id.

Paragraph 4 states that "Cognitive Edge Pvt. Ltd. contends it has provided Code Genesys with Confidential Information (defined [in paragraph 5(a) and (b)]) that it wishes to protect. Cognitive Edge contends it owns the rights to the Confidential Information it has provided Code Genesys during the parties' relationship and designated in this Action as Highly Confidential Attorney's Eyes Only." Id. Cognitive Edge is referred to as the "Disclosing Party," and "Confidential Information" is defined as: (1) MassSense Source Code; (2) SenseMaker Source Code; (3) Signifier Layers Document; and (4) MassSense Overview. Id. ¶ 5(a),Attach. A.[3]

Paragraph 5(c) addresses "Permitted Use" of the "Confidential Information." It reads:

> Recipient acknowledges and agrees it shall treat the Confidential Information on a confidential basis. Cognitive Edge acknowledges Code Genesys disputes whether such information is proprietary and confidential, but will nonetheless treat it as such with regard to any and all third parties. To the extent Cognitive Edge believes Code Genesys has used or relied upon this Confidential Information in developing the Spryng.io platform or for any other purpose, Cognitive Edge agrees Code Genesys is free to use and incorporate same in its services and products from now to the end of time for the sole purpose of commercialization of the Spryng.io product. Nothing contained herein alters or changes Code Genesys' agreement to not disclose any confidential information of Cognitive Edge to any other party.

Id.

---

[3] Paragraph 5(b) carves out the following exclusions: "Confidential Information shall not include information that: (a) was discovered or created by, or was otherwise in the possession of Recipient before its receipt from [Cognitive Edge]; (b) is or becomes available to the public through no fault of Recipient; (c) is received by Recipient in good faith from a third party having no duty of confidentiality to [Cognitive Edge] or (d) is required to be disclosed by law or court action . . . ."

Paragraph 6 addresses confidentiality of the Settlement Agreement:

> This Memorandum of Understanding is Confidential Information for purposes of this agreement. Each of the Parties agrees to keep confidential and will not disclose to any person, other than its financial, tax or legal advisors, any of the terms and conditions of this Memorandum of Understanding or the substance of any discussions preceding this Memorandum of Understanding, except as may be required by applicable law or as otherwise agreed to, in advance and in writing, by all Parties. Notwithstanding the foregoing, the Parties further agree that the Parties may disclose that this dispute has been resolved without adopting or requiring any further relationship between and among the Parties.

Id. Paragraph 7 provides that "[t]he Parties shall jointly and publicly disclose: "the parties have reached an agreement that resolves the parties' lawsuit." Id.

Paragraph 8 contains the following non-disparagement provision:

> The Parties undertake, on behalf of themselves and any person acting by, through, under, or in concert with them, to refrain from defaming or disparaging any of the Parties, their products, services, finances, financial condition, capabilities, or other aspect of their businesses, or any former or existing employees, managers, directors, officers, or agents of, or contracting parties with any of the Parties. These undertakings apply in any medium and by any method to any person or entity without limitation in time.

Id.

Paragraph 9 requires that the Settlement Agreement be "construed and enforced in accordance with and governed by the laws of the Commonwealth of Massachusetts exclusive of conflicts of laws principles" and makes clear that the Agreement is fully integrated. Id.

Paragraph 10 reads:

> This Memorandum of Understanding shall be admissible in any proceeding to enforce the terms thereof, if necessary, and the prevailing party in any such proceeding shall be entitled to recover costs, including reasonable attorneys' fees, incurred thereby.

Id.

David Snowden as CSO signed on behalf of Cognitive Edge and Ajay Reddy as CEO signed on behalf of Code Genesys, Spryng.io, LLC, Spryng.io Anthrocomplexity, LLC, and Spryng.io EU Ltd. Id.

D. Code Genesys's Marketing Email and Linked Webpages

Ajay Reddy and Jack Speranza met immediately after executing the Settlement Agreement to discuss a marketing campaign for the Spryng.io Platform, Tr. 115-16, and a response to the customer concerns, noted in Section II(A) above, regarding possible legal liability resulting from use of the platform. Tr. 130-131. Reddy and Speranza subsequently created informational web pages on the Spryng.io website[4] which the court now describes in relevant part.

The top line of a header on each page stated in large text, "Spryng.io, SenseMaker & Cognitive Edge." Tr. Exh. 7 at 1. The following line of the header stated: "The materials in this section are published to provide complete transparency into the history and final outcome of legal proceedings that confirmed Spryng.io's full ownership of and rights over the technologies and other capabilities embodied in the Spryng.io Platform." Id. (underline added).

The "Introduction" page of the website stated that "As we move forward with further expanding Spryng's capabilities, we do so with absolute clarity and finality on our complete ownership of and rights over all the technologies embodied in the Spryng.io platform. And nobody has to just take our word for it." Tr. Exh. 7 at 1 (Emphasis in original, underline added).

The "Lawsuit" page of the website stated as part of the "Relevant Background":

> …we agreed to refrain from engaging in further sales and marketing activities in consideration of the court's offer to conduct an expedited trial on all issues . . .

---

[4] At trial, Defendants did not challenge the authenticity of the Original and Revised webpage screen shots and stipulated that "Jack Speranza was the principal author on Defendants' behalf" of the Original Version and Revised Version of the website. See Joint Pretrial Mem. 7-8 [#71].

> That trial, originally scheduled for early September 2019, <u>finally commenced and concluded on October 7, 2019</u>.

Tr. Exh. 7 at 3 (underline added). The page stated further, under the heading "Public Docket," that the site included a link to select materials filed with the court and that "[f]or those interested, the entire scope of materials filed in this litigation is available for inspection by any member of the public through the court system's PACER application." <u>Id.</u>

The "U.S. Patents" page stated under the heading "Summary" that Cognitive Edge had contended that its patents prohibited another party from developing and offering certain software or similar tools, and that Spring.io disagreed. The text continued:

> There are reasonable grounds to suggest the Cognitive Edge patents are invalid and unenforceable due to the existence of relevant non-patent literature, including such non-patent literature the inventors likely had knowledge of but failed to provide to the examiner responsible for examining the patent application.

Tr. Exh. 7 at 5. The page also contained a link that reads "View Legal Opinion on Method Patents." <u>Id.</u>

The link gave visitors access to a legal opinion letter ("the Opinion Letter") regarding "Noninfringement, Potential Unenforceability and Potential Invalidity of US Patent Nos. 8,031,201 and 8,339,410" drafted by a law firm called CaseiroBurke and dated February 19, 2019.[5] Tr. 144-45; <u>see</u> Tr. Exh. 7 at 7-20.

The final page, labeled "Outcome," stated under a heading called "Procedural Background":

> On the morning of Monday, October 7, 2019, Judge Indira Talwani presided over a very short bench trial (meaning Judge only – no jury) on this matter. After taking limited evidence, she encouraged the parties to accept a recess and focus

---

[5] The first page of the letter is dated February 19, 2019. Subsequent pages are dated February 18, 2019. The discrepancy is not material.

their efforts on finalizing the language for an agreement that appeared to have been reached in principle at the end of the prior week.

Tr. Exh. 7 at 21. The page stated further that "[i]n ending their disputes and the lawsuit, Code Genesys and Cognitive Edge agreed to keep the specific terms of the resolution confidential." Id.

Defendants sent a marketing email "blast" to more than 170 people with a link to these web pages.[6] Tr. 31; 76-77; 123. The email contained a link to the Spryng.io website. Tr. 23-24.

Plaintiff learned of this marketing email from a number of their customers who had received it. Tr. 23-24; 40. Those customers called Cognitive Edge seeking a response to the statements made by Defendants on the Spryng.io website. Tr. 43. Cognitive Edge did not respond out of a desire to comply with the Settlement Agreement. Tr. 34-35, 42.

Snowden viewed the website and sought advice from Cognitive Edge's legal counsel, Tr. 23, 33-34, and Cognitive Edge's counsel contacted Code Genesys. With Speranza as the principal author on Defendants' behalf, see Joint Pretrial Mem. 8 [#71], Code Genesys thereafter made revisions to the informational Spryng.io web pages (the "Revised Version"). Tr. 36; see also Tr. Exh. 2 (October 15, 2019 letter from Jack Speranza stating that Code Genesys had immediately modified specific elements of the web pages).

On the Revised Version, the language in the second line of the header stating "legal proceedings that confirmed Spryng.io's full ownership of and rights over the technologies and other capabilities embodied in the Spryng.io Platform," Tr. Exh. 7 at 1, was replaced with "legal proceedings that affirm Spryng.io's full rights to the Spryng.io Platform." Tr. Exh. 8 at 1. The statement on the "Introduction" page concerning moving forward in expanding the Spryng.io

---

[6] In response to Plaintiff's request for "a list of the names of people who received e-mail lists or the e-mail blast that directed them to the websites," Defendants provided Exhibit 3. Tr. 41-42. Plaintiff contends that the list is incomplete and that the blast email was sent to additional recipients, Tr. 40, but did not offer evidence to support this contention.

platform with "absolute clarity and finality on our complete ownership of and rights over *all* the technologies embodied in the Spryng.io platform," Tr. Exh. 7 at 1, was replaced with "absolute clarity and finality on our full rights to the Spryng.io platform." Tr. Exh. 8 at 1.

The "Relevant Background" section of the "Lawsuit" page stating that the "Trial finally commenced and concluded on October 7, 2019," Tr. Exh. 7 at 3, was revised to reference on the same date "a preliminary hearing before Judge Indira Talwani in which she took limited evidence." Tr. Exh. 8 at 3. The "U.S. Patents" page of the Revised Version was not revised, and the page continued to include the link to the Opinion Letter. Tr. Exh. 8 at 5-19. Defendants did not send a corrective disclosure to the recipients of the mass email mailing. See Plaintiff's Post-trial Proposed Findings of Fact and Conclusions of Law ("Pl.'s Post-trial Mem.") Relief Requested ¶ C [#76] (seeking an order that Defendant Cognitive Edge "contact each of the individuals it contacted in October 2019" with the link to the Spryng.io website and inform them that the linked website included "misinformation").

Cognitive Edge continued to object to the webpages, see Tr. Exh. 2 (October 15, 2019 letter from Jack Speranza stating that after notifying Cognitive Edge of the changes, Cognitive Edge had continued to object to Code Genesys that the content was defamatory), and eight days after the parties had entered into the Settlement Agreement, Cognitive Edge brought this lawsuit. The following day, on Plaintiff's Motion [#3], the court ordered Defendants to "remove information from their website or websites referring to Plaintiff, its products, property, employees or businesses," Temporary Restraining Order [#15], and that directive has remained in place through this litigation. See Order Extending TRO [#23]; Preliminary Injunction [#31].

E.  Defendants' Further Communications to Potential Customers

On November 7, 2019, Defendants' CEO Ajay Reddy forwarded the Opinion Letter regarding Cognitive Edge's patents to a prospective customer, John Golds of Castleton Consulting, who is not listed among the blast email recipients. Tr. 39, 74, 85-87; Tr. Exhs. 3, 5. He did so after Mr. Golds raised concerns about the status of Defendants' intellectual property rights. Tr. 86, 95-97; Tr. Exh. 5.

Reddy also testified about communications with another prospective customer, to whom he referred only as "Sarah" because he did not remember her last name, though later recalled that it starts with an "F". Tr. 99-100, 102. Sarah shared Mr. Golds' concern about intellectual property rights and, additionally, mistook Reddy for the "CEO of Cognitive Edge," when, in fact, he is the CEO of Code Genesys and the Spryng companies. Tr. 96-100. The timing of Sarah's concerns are unclear; there is no record evidence that she referenced the Spryng.io website and there is no "Sarah" on the list Defendants provided naming recipients of their email blast. See Tr. Exh. 3; Tr. 39, 74.

On November 22, 2019, Reddy sent an email to a contact "generally [] regarded as an expert in the field" of sense-making stating that "Dave being Dave, we expect that there will always be undertones perpetuated among the community…" Tr. 81-85; Tr. Exh. 6. "Dave" refers to the founder and CSO of Cognitive Edge, David Snowden. Tr. 82.

F.  Cognitive Edge's Claimed Harm

Plaintiff contends that, as a result of Defendants' website, it lost a significant business relationship with a woman named Glenda Eoyang. Pl.'s Post-trial Mem. ¶ 117 [#76]; see also Tr. 43 (testimony of CSO Snowden). Defendants' CEO, Ajay Reddy, acknowledged that Eoyang is a "leader" in the professional community, but asserted that she had a prior "professional

relationship" with "one of" Reddy's companies for "a couple of years" and had joined the board of one of the defendant companies prior to being approached by Cognitive Edge. Tr. 92-94. In the absence of further information regarding Eoyang's motivations, the court finds the evidence insufficient to establish that Defendants' actions impacted Eoyang's relationship with Cognitive Edge.

Plaintiff contends more generally that Defendants' blast email resulted in "market confusion," the loss of business relationships, time spent on the dispute, and legal fees. Pl.'s Post-trial Mem. ¶ 57 [#76]. Plaintiff's CSO, David Snowden, acknowledged, however, that only the legal fees could be quantified. Tr. 42. At trial, Cognitive Edge established that it incurred legal fees of $133,792.92 in this matter through June 30, 2020. Tr. 45; Tr. Exh. 21; Tr. Exh. 22.

III.  Conclusions of Law

A. Count 1: Breach of Contract

Plaintiff's Breach of Contract claim alleges a breach of the parties' Settlement Agreement. Paragraph 9 of that agreement provides that the terms be "construed and enforced in accordance with and governed by the laws of the Commonwealth of Massachusetts." Tr. Exh. 1. "Under Massachusetts law, a claim for breach of contract requires the plaintiff to show the existence of a valid and binding contract, that the defendant breached the contract's terms, and that the plaintiff suffered damages as a result of that breach." Scholz v. Goudreau, 901 F.3d 37, 43 (1st Cir. 2018). There is no dispute here that the Settlement Agreement is a valid and binding contract.

Plaintiff argues that Defendants breached the Settlement Agreement by statements Defendants made in the Spryng.io website linked to the email blast, and in subsequent email communications. Plaintiff's Trial Brief ("Pl.'s Tr. Br.") 13-14 [#72]; Pl.'s Post-trial Mem. ¶¶ 55,

82 [#76]. Plaintiff contends that it suffered "market confusion," harm to its reputation and goodwill, and incurred legal fees as a result of Defendants' breach. Pl.'s Post-trial Mem. 5-6 [#76]. Defendants dispute that Plaintiff has demonstrated any breach of the Settlement Agreement or that it suffered any damages caused by any such breach. Defendants' Post-trial Proposed Findings of Fact and Conclusions of Law ("Defs.' Post-trial Mem.") 10-11 [#77].[7]

### 1. Breach of the Settlement Agreement

Under the Settlement Agreement, the parties acknowledged Cognitive Edge's contention that it had provided Code Genesys with Confidential Information that Cognitive Edge owned and wished to protect, including the MassSense Source Code and SenseMaker Source Code, and that Code Genesys disputed whether such information was proprietary. Tr. Exh. 1 ¶ 5(a), Attach. A. Without resolving that dispute, the Settlement Agreement permitted Defendants to use and incorporate the information Cognitive Edge had provided in Defendants' "services and products from now to the end of time for the sole purpose of commercialization of the Spryng.io product," while treating the information as confidential with regard to all third parties. Tr. Exh. 1 ¶ 5(c). The parties agreed further to keep all terms of the Settlement Agreement confidential, and

---

[7] Plaintiff also complains that Defendants filed the Agreement on the public docket in this action in violation of Paragraph 6. Pl.'s Tr. Br. 14-15 [#72]; Pl.'s Post-trial Mem. ¶¶ 51, 81 [#76]; see also Tr. Exh. 1 ¶ 6. Plaintiff is correct that Defendants filed the Agreement on the public docket, see docket entry for Opposition to Motion for TRO and Preliminary Injunction, Exh. 2 [#28-2] (filed on October 31, 2019, at 6:43 p.m.), and that this public filing occurred after the Agreement had been filed under seal on the docket. See Elec. Clerk's Notes [#19] (court granted in open court on October 15, 2019, Plaintiff's motion to file the Settlement Agreement under seal); Sealed Settlement Agreement [#13]. However, within 45 minutes of Defendants' filing of the Settlement Agreement on the public docket, the court placed the document under seal. See Elec. Ord. [#29] (filed on October 31, 2019 at 7:24 p.m.). The Settlement Agreement remained under seal until counsel for all parties agreed to unsealing the Settlement Agreement, and the docket entry was then unsealed on November 6, 2019. See Elec. Clerk's Notes [#34]. Notably, Plaintiff has not included this alleged breach of the Settlement Agreement in an amended complaint or demonstrated any harm resulting from the unsealed filing.

moreover, "to refrain from defaming or disparaging any of the Parties, their products, services, finances, financial condition, capabilities, or other aspect of their businesses, or any former or existing employees, managers, directors, officers, or agents of, or contracting parties with any of the Parties." Tr. Exh. 1 ¶¶ 6, 8.

As a threshold matter, the parties dispute the proper construction of the term "defaming or disparaging." Defendants propose that the Settlement Agreement bars only "common law commercial disparagement." Defendants' Trial Brief ("Defs.' Tr. Br.") 6, 10-11 [#73]; Defs.' Post-trial Mem. 18-19 [#77]. Plaintiff contends that the term "disparaging" should be given its plain and ordinary dictionary meaning. Pl.'s Post-trial Mem. ¶ 64, 64 n.12 [#76].

"Under Massachusetts law, contract interpretation is a question of law for the court unless the contract is ambiguous," which is not necessarily the case "merely because the litigants disagree about the meaning of a contract." Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004). Indeed, contract language "is unambiguous unless the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." A.L. Prime Energy Consultant, Inc. v. Massachusetts Bay Transportation Auth., 479 Mass. 419, 431 (2018) (internal quotation omitted). In assessing whether a contract is ambiguous, "the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011) (internal citation omitted).

"[W]hen contract language is unambiguous, it must be construed according to its plain meaning." Id. (quoting Balles v. Babcock Power Inc., 476 Mass. 565, 571–572 (2017)). "Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." Szulik v. State Street Bank and Trust Co., 935 F.Supp.2d 240, 255 (D. Mass. 2013)

(quoting <u>Cadle Co. v. Vargas</u>, 55 Mass. App. Ct. 361, 366 (2002)). At the same time, the court

must "consider the contract as a whole." <u>Farmers Ins. Exch.</u>, 632 F.3d at 785. "Its meaning

'cannot be delineated by isolating words and interpreting them as though they stood alone.'"

<u>Nicolaci</u>, 387 F.3d at 26 (quoting <u>Starr v. Fordham</u>, 420 Mass. 178, 648 N.E.2d 1261, 1269

(1995)). "Not only must due weight be accorded to the immediate context, but no part of the

contract is to be disregarded." <u>Starr</u>, 648 N.E.2d at 1269.

Defendants assert that the term should be interpreted in accordance with the requirements

for a tort claim for "commercial disparagement," and that "commercial disparagement" and

"defamation" both impose liability "for harm sustained . . . as a result of the publication of a

false statement about the plaintiff to others" but that in "commercial disparagement" Plaintiff

must also show that the false statement was made "'of and concerning' the plaintiff's products or

services; []with knowledge of the statement's falsity or with reckless disregard of its truth or

falsity; [] where pecuniary harm to the plaintiff's interests was intended or foreseeable; and []

such publication resulted in special damages in the form of pecuniary loss." Defs.' Tr. Br. 6, 10-

11 [#73]. But nothing in the contract language suggests that the contractually prohibited conduct

is that which would also amount to a tort. Moreover, although the contract was entered into

between businesses, it protects against statements directed at "any former or existing employees,

managers, directors, officers, or agents of, or contracting parties with any of the Parties." The

term is also not limited to "defaming" (a term directed to false statements, as Defendants

acknowledge), but also "disparaging" (a term that would be meaningless if Defendants'

construction is adopted).

The court looks instead to the "plain meaning" of "defaming or disparaging," <u>see</u> <u>id.</u>,

which includes both "publication of a false statement" about the protected party to others, <u>see</u>

Defs.' Tr. Br. 6, 10-11 [#73], and "depreciate[ion] by indirect means (such as invidious comparison)," "speak[ing] slightingly about," or "lower[ing] in rank or reputation." Disparage Definition, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/disparage (last visited December 17, 2020). This meaning is consistent with the scope of protection included in the contract, which under the heading "Public Statement/Non-Disparagement" protects not only the businesses and connected individuals as noted above, but also the businesses' "products, services, finances, financial condition, capabilities, or other aspect of their businesses." Exh. 1 ¶ 8.

In sum, the court finds the term "defaming or disparaging" unambiguous and proceeds to consider whether there was a breach based on the plain meaning of the term.[8]

a. *Whether Defendants' Statements on the Spryng.io Website Were "Defaming or Disparaging"*

Plaintiff contends that the Original Version of Defendants' webpages implied that the Prior Lawsuit was adjudicated on the merits and decided in Defendants' favor, which is both false and disparaging. See Pl.'s Tr. Br. 13 [#72]. Plaintiff argues that "Defendants' cherry picked their own documents to suggest that they won at trial" which would mean that "what they alleged in the Action about Cognitive Edge (that it acted in bad faith and breach a contract) was true and

---

[8] The outcome would be no different if the court found the contract language ambiguous. In that event, its meaning "becomes a matter for the factfinder," Den Norske Bank AS v. First Nat. Bank of Bos., 75 F.3d 49, 52 (1st Cir. 1996), which, in this case, is also the court. The factfinder must "ascertain[] the intent of the parties as imperfectly expressed in ambiguous contract language." Id. To that end, the factfinder may consider, in descending order of importance, (1) the parties' negotiations, (2) their course of performance, (3) their prior course of dealing, and (4) trade usage in the industry. Id. at 52-53. Here, this extrinsic evidence, insofar as it is part of the record before the court, supports the plain meaning of the term where the parties, with the assistance of litigation counsel, entered into this settlement agreement to resolve the Prior Lawsuit without trial, and the plain meaning of the term "disparaging" appears consistent with their attorneys' good faith attempt to have the parties move forward with their respective businesses without harming each other.

what Cognitive Edge alleged about Defendants (that they stole trade secrets) was false." Pl.'s Tr. Br. 13 [#72]. Specifically, "on the 'Outcome' page, Defendants state that on 'the morning of Monday, October 7, 2019, Judge Indira Talwani presided over a very short bench trial (meaning judge only – no jury) on this matter.' The implication is that Judge Talwani somehow adjudicated ownership of Spryng.io in Code Genesys' favor." Pl.'s Tr. Br. 13 [#72]. The court agrees, and finds that the Original Version of Defendants' website falsely implied that the matter was adjudicated in their favor on the merits when, in fact, the matter was resolved by the Settlement Agreement to address forward-looking issues only and without any resolution of the allegations of prior wrongdoing.

Plaintiff argues further that the header on the Original Version of Defendants webpages was both "false and disparaging" because "[t]he Settlement Agreement does not 'confirm' Defendants' 'full ownership of and rights' as it relates to the 'Spryng.io Platform.'" Plaintiff's Tr. Br. 12 [#72]. It is, indeed, false that the Settlement Agreement resolved Spryng.io's purported ownership of the technologies and other capabilities embodied in the Spryng.io Platform. To the contrary, the Settlement Agreement explicitly acknowledges but does not resolve Cognitive Edge's contention that it owns the rights to the Confidential Information it has provided Code Genesys during the parties' relationship," Tr. Exh. 1 ¶ 4, where "Confidential Information" is defined in the Agreement to include the SenseMaker Source Code and the MassSense Source Code, Tr. Exh. 1, Attach. A, the latter of which, at least, became embedded in the Spryng.io software platform. Tr. 11-12; 65-66. The assertion of Defendants' full ownership is also disparaging of Plaintiff's asserted ownership of confidential information in the Spryng,io

software platform and Plaintiff's patents.[9]

Plaintiff contends finally that "[o]n the 'U.S. Patents' page, Defendants characterize and offer opinions about the supposed invalidity of Cognitive Edge's patents. The patents were an issue raised during the underlying lawsuit and the patents are covered by the non-disparagement provision. Defendants publishing statements opining that Cognitive Edge's patents are invalid is disparaging and breach of the Settlement Agreement." Pl.'s Tr. Br. 14 [#72]. Defendants do not dispute that the patents are covered by the non-disparagement provision of the Settlement Agreement. The Settlement Agreement itself requires, inter alia, parties to "undertake, on behalf of themselves and any person acting by, through, under, or in concert with them, to refrain from defaming or disparaging any of" the parties' "products" or "services" and does not include any limitations on that agreement. Both the Original and Revised Versions of the webpage states:

> There are reasonable grounds to suggest the Cognitive Edge patents are invalid and unenforceable due to the existence of relevant non-patent literature, including such non-patent literature the inventors likely had knowledge of but failed to provide to the examiner responsible for examining the patent application.

Tr. Exh. 7 at 5; Tr. Exh. 8 at 5. The suggestion that Cognitive Edge's patents may be found invalid is harmful to Cognitive Edge's product's marketability. In testimony, David Snowden, CSO of Cognitive Edge, explained that, "if that was true" it "means that anybody could take our ideas and put them into standard survey software or create another product without our having any rights against it." Tr. 31. He testified that the non-disparagement clause in the Settlement Agreement "was a matter of major concern for us" specifically because the "false claims about

---

[9] The revised version removed the language claiming that Spryng.io had any "ownership" of or "rights" to "the technologies and other capabilities embodied in the Spryng.io Platform" and, instead, merely asserts "rights" to the platform itself. As revised, this statement does not violate the Settlement Agreement where that Settlement Agreement accorded Defendants the right to use Plaintiff's information.

our patents… were potentially damaging to us, and we wanted that to cease." Tr. 22. Moreover, where Snowden was responsible for obtaining the patents, <u>see</u> Tr. 30, the suggestion that he "likely had knowledge" of relevant information that he "failed" to disclose to the patent examiner implies that he acted improperly in obtaining the patents. That implication disparages Snowden, an "officer[]" of Cognitive Edge, which is prohibited under the Settlement Agreement. Tr. Exh. 1 ¶ 8.

b. *<u>Whether Defendants' Republication of the Opinion Letter Was "Defamatory or Disparaging"</u>*

Plaintiff objects that the website's link to the patent Opinion Letter and a separate November 7, 2019 email that Ajay Reddy sent to Castleton Consulting, a business contact and prospective customer, Tr. Exh. 5; <u>see also</u> Tr. 85-87, 95-96, were also defamatory and disparaging. Reddy testified that the recipient of the November 7 email had expressed concerns about Code Genesys' intellectual property and that he shared the Opinion Letter in order to alleviate any related concerns the recipient had. Tr. 96-97. He testified that others had expressed similar concerns and informed him that they were, as a result, not interested in doing business with Code Genesys. Tr. 99. Jack Speranza explained that the patent Opinion Letter itself was obtained prior to going to market with the Spryng.io Platform because prospective customers had questioned "whether or not even engaging in any kind of a sense-making process outside of the Cognitive Edge realm presented potential legal liabilities because of the patents, the patents issue. And so…we knew…that was an issue that we needed to address." Tr. 145.

To the extent that Code Genesys sought to address this issue, it could have done so in the Prior Lawsuit, where any such expert opinion, if admissible at all under Federal Rules of Evidence 702 – 705, would have been subjected to cross-examination and resolution by a neutral fact-finder. Code Genesys did not ultimately seek that resolution, and instead resolved the issue

of whether Defendants have a right to market the Spryng.io Platform <u>without any determination</u> <u>as to the validity of Plaintiff Cognitive Edge's patents</u> and with an explicit agreement not to disparage Plaintiff or its products or officers or employees. While the Settlement Agreement allowed Code Genesys a contractual right to market products that "engag[e] in any kind of a sense-making process," Code Genesys did not have the right to disparage Cognitive Edge, or its patents or officers, and, as such, the publication of the Opinion Letter breached the Agreement.

       *c.*    *Whether Statements Made on the Spryng.io Website and the Publication of the Opinion Letter Caused Plaintiff Harm*

Plaintiff contends that Defendants' statements detailed above damaged "[t]he goodwill and reputation of Cognitive Edge, David Snowden, and Cognitive Edge's SenseMaker product" and caused "market confusion." Pl.'s Post-trial Mem. 5-6 [#76].[10] Plaintiff has offered as evidence of this harm only the general testimony of Cognitive Edge's CSO David Snowden that there is a "goodwill issue," that Cognitive Edge is "losing credibility," and that customers have called specifically seeking a response to the statements made on the Spryng.io website, <u>see</u> Tr. 43, but Plaintiff has made no claim that this harm is quantifiable in damages. Defendants assert that, without more, Plaintiff has failed to establish damages from the breach, and the contract claim fails.

The court need not resolve this dispute as to harm to Cognitive Edge's good will or credibility where Plaintiff also asserts as damage the legal fees it incurred as a result of Defendants' breach of the Settlement Agreement. <u>See</u> Pl.'s Post-trial Mem. 5-6 [#76]. "'Damages are recoverable for special losses incurred in a reasonable effort, whether successful

---

[10] Plaintiff also complains that the breach interfered with Cognitive Edge's fledging business relationship with Glenda Eoyang. On this allegation, the court finds that Plaintiff has not demonstrated that the relationship ended because of statements on the Spryng.io website where Ms. Eoyang had a pre-existing business relationship with Code Genesys' Ajay Reddy.

or not, to avoid harm that the defendant had reason to foresee as a probable result of his breach when the contract was made.'" Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 484-85 (1991) (quoting Restatement, Contracts, § 336(2)). The plaintiff has the burden of proof to "'show that the expenses incurred were reasonable.'" Id. at 485 (quoting Automated Donut Syss., Inc. v. Consolidated Rail Corp., 12 Mass. App. Ct. 326, 335, 424 N.E.2d 265 (1981)). The court here finds Plaintiff's legal fees incurred in contacting Defendants' counsel and having the original website modified and in obtaining the temporary restraining order and preliminary injunction were reasonable post-breach expenditures made in mitigating the breach. This harm is sufficient to sustain the breach of contract claim where the Defendants' defaming and disparaging statements were the type of statements that would likely lead to loss of good will, and Plaintiff's efforts to mitigate that loss by seeking to have the statements removed from public view were in keeping with its duty to mitigate.[11] As such, the court finds that Defendants breached the Settlement Agreement's requirement that they "refrain from…disparaging any of the Parties, their products…or any former or existing employees…officers, or agents of…any of the Parties," see Tr. Exh. 1 ¶ 8, but that Plaintiff's proven damages are limited to its legal fees and costs.

---

[11] See e.g. Cummings Properties, LLC v. Nat'l Commc'ns Corp., 449 Mass. 490, 497 (2007) (referencing the "duty to mitigate damages" with regard to the breach of a lease agreement); see also McKenna v. Comm'r of Mental Health, 347 Mass. 674, 676 (1964) (quoting Corbin, Contracts, § 1039: "'It is not infrequently said that it is the 'duty' of the injured party to mitigate his damages so far as that can be done by reasonable effort on his part. Since there is no judicial penalty, however, for his failure to make this effort, it is not desirable to say that he is under a 'duty.' His recovery against the defendant will be exactly the same whether he makes the effort and mitigates his loss, or not; but if he fails to make the reasonable effort, with the result that his injury is greater than it would otherwise have been, he cannot recover judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the loss that he helped to cause by not avoiding it").

B.  Underline{Count 2: Breach of the Implied Covenant of Good Faith and Fair Dealing}

Plaintiff alleges that the Settlement Agreement "contains an implied covenant that Defendants would perform their obligations in good faith" and that Defendants "did not act in good faith in their public statements and disparagement of Cognitive Edge." Am. Compl. ¶¶ 49-50 [#26].

"The covenant of good faith and fair dealing is implied in every contract,...including contracts between sophisticated business people." Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 189 (2016) (quoting Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014) (citations omitted)). The covenant ensures "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" so that "the objectives of the contract may be realized." Id. (quotations and citations omitted). As such, "[a] party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract." Speakman v. Allmerica Fin. Life Ins., 367 F. Supp.2d 122, 132 (D. Mass. 2005) (citing Marx v. Globe Newspaper Co., Inc., 13 Mass. L. Rep. 190, **10–11 (Mass. Super. 2001) and Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 101, 105 (1977)). Rather, "'[a] breach occurs when one party violates the reasonable expectations of the other.'" Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014) (quoting Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007)).

To determine whether a party violated the implied covenant of good faith and fair dealing, a court looks "'to the party's manner of performance.'" Robert & Ardis James Found., 474 Mass. at 189 (quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010)). A plaintiff need not demonstrate that a defendant has acted in bad faith, but bears the burden of proving a lack of good faith, which can be inferred from the totality of the circumstances. Robert

& Ardis James Found., 474 Mass. at 189. The First Circuit has described a lack of good faith as implying "'a dishonest purpose, conscious doing of wrong, or breach of duty through motive of self-interest or ill will.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013) (quoting Hartford Accident & Indem. Co. v. Millis Roofing & Sheet Metal, Inc., 11 Mass. App. Ct. 998 (1981)).

> Evidence that a party behaved in a manner unreasonable under all the circumstances may indicate a lack of good faith, but the core question remains whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract.

Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 238 (1st Cir. 2013) (internal quotations and citations omitted).

Here, Defendants' actions violated Plaintiff's reasonable expectations. As the Settlement Agreement recited, Cognitive Edge "desire[d] to . . . settle and resolve all differences and disputes that exist or may exist between [the Parties] relating to the Action and/or the subject matter thereof" and entered into the Settlement Agreement "for purposes of settlement and compromise, and [to] avoid further costs of litigation . . . ." Tr. Exh. 1, Preamble. The Settlement Agreement allowed Defendants to use information that Plaintiff contended belonged to Plaintiff, but did so without according Defendants ownership rights to the information, and with the express agreement that Defendants would not disparage Plaintiff or disclose the terms of the Settlement Agreement, and would jointly disclose that their dispute was resolved by settlement. In other words, the Settlement Agreement sought to put the parties prior dispute behind them without the expense of resolving it. Defendants obtained what amounted to a license to use the information claimed by Plaintiff, but Plaintiff did not grant ownership. Rather than respecting that compromise and the purpose of that agreement, Defendants made statements that amounted

to a false announcement that they had won the dispute and published the Opinion Letter both through the website and in a subsequent email. The court finds from these facts that Defendants "violate[d] the reasonable expectations of" Plaintiff, see Weiler, 469 Mass. at 82.

As Plaintiff points out, see Pl.'s Tr. Br. 20-24 [#76], while Defendants sought to address what they viewed as negative comments from Cognitive Edge prior to entering into the Settlement Agreement (including obtaining the Opinion Letter discussed above), Speranza claimed at trial in this action that such concerns were not "foremost on our mind" while finalizing the Settlement Agreement, including its non-disparagement provision. Tr. 118. Yet "immediately" after signing the Settlement Agreement, Speranza met with Ajay Reddy to discuss what needed to be done "to begin remarketing the [Spryng.io] product again and begin selling the product once again," including finding a way "to provide…key players in the marketplace with an indication that they were free and clear to use [the Spryng.io Platform] as a competing product to Cognitive Edge's product." Tr. 115-16. The court agrees that Defendants' attempt to assert full ownership of the information explicitly claimed by Cognitive Edge and Defendants' publication of the Opinion Letter each constitute a "breach of duty through motive of self-interest" that "had the effect of injuring [Plaintiff's] rights to the fruits of the contract." See Young, 717 F.3d at 238. As such, they amount to a breach of the implied covenant of good faith and fair dealing.

C. Count 3: Unfair and Deceptive Practices in Violation of M.G.L. c. 93A §§ 2 and 11

Extrapolating from its proposed findings of fact and conclusions of law, Plaintiff appears to contend that Defendants' statements on the Spryng.io website addressing the validity of Platintiff's patents violated M.G.L. c. 93A by amounting to common-law commercial

disparagement, defamation, and libel, as well as by violating the covenant of good faith and fair dealing. See Pl.'s Post-trial Mem. 26-29 [#76].

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are…declared unlawful" under M.G.L. c. 93A § 2. A "person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice" may recover the amount of actual damages, or, if that person "has not suffered any loss of money or property, [he] may obtain such an injunction if it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property." M.G.L. c. 93A § 11. "To prove such a claim, it is neither necessary nor sufficient that a particular act or practice violate common or statutory law." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir.2009) (citing Kattar v. Demoulas, 433 Mass. 1, 739 N.E.2d 246, 257 (2000)). "Instead, Massachusetts courts 'evaluate unfair and deceptive trade practice claims based on the circumstances of each case,' leaving 'the determination of what constitutes an unfair trade practice to the finder of fact.'" In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 184 (1st Cir. 2009) (quoting Mass. Eye & Ear Infirmary, 552 F.3d at 69.

"In determining whether a practice violates Chapter 93A, [the factfinder] look[s] to '(1) whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412

F.3d 215, 243 (1st Cir. 2005) (quoting <u>PMP Assocs., Inc. v. Globe Newspaper Co.</u>, 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). "The 'crucial factors' in an unfairness inquiry are 'the nature of [the] challenged conduct and on the purpose and effect of that conduct.'" <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 582 F.3d at 184 (quoting <u>Mass. Employers Ins. Exch. v. Propac–Mass, Inc.</u>, 420 Mass. 39, 648 N.E.2d 435, 438 (1995)). Chapter 93A does not attach liability for all "unseemly business practices," and, between commercial entities, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." <u>Id.</u> at 185 (quoting <u>Mass. School of Law at Andover, Inc. v. American Bar Ass'n</u>, 142 F.3d 26, 41–42 (1st Cir.1998) (internal citations omitted)). A Chapter 93A determination between commercial entities thus requires not only that the defendant's conduct be wrong, but "egregiously wrong." <u>Id.</u> (quoting <u>Mass. School of Law at Andover, Inc.</u>, 142 F.3d at 41); <u>see also</u> <u>Giuffrida v. High Country Inv'r, Inc.</u>, 73 Mass. App. Ct. 225, 238 (2008) ("[B]usinesses seeking relief under Section 11 are held to a stricter standard than consumers in terms of what constitutes unfair or deceptive conduct" (quoting Chapter 93A Rights & Remedies § 2.5, at 2–67 (Mass. Cont. Legal Educ. 2d ed. 2007))).

Plaintiff relies on <u>T.W. Nickerson, Inc. v. Fleet Nat. Bank</u>, where the Supreme Judicial Court acknowledged that a breach of the covenant of good faith and fair dealing may constitute a violation of M.G.L. c. 93A. 456 Mass. 562, 576-77 (2010). In that case, the SJC notably declined to determine, however, whether a breach of the covenant of good faith and fair dealing compels a finding of a violation of Chapter 93A. <u>Id.</u> at 577. The SJC and First Circuit's general guidance, as set forth above, compels consideration of the conduct at issue, rather than the label. While Plaintiff has proven Defendants' lack of good faith, it has not shown that Defendants' conduct reaches a "level of rascality" sufficient to support a finding that they engaged in an unfair

business practice under Chapter 93A, particularly where the most egregious material was promptly removed from the website following a demand from Plaintiff's attorney, and where Plaintiff has not demonstrated that Defendants' actions have caused any loss from unfair competition, or any loss of money or property at all, other than attorneys' fees. Accordingly, the court finds no Chapter 93A violation.[12]

D.  Count 4: Lanham Act False Advertising Under 15 U.S.C. § 1125(a)(1)(B)

Plaintiff contends that "Defendants' marketing campaign concerning Cognitive Edge, including its website content caused and is still causing market confusion about Cognitive Edge's product ('SenseMaker') and ownership of the Spryng.io platform" and that "[t]he statements made by Defendants on its website were false and/or misleading..." Pl.'s Post-trial Mem. 29-30 [#76]. Defendants respond that Plaintiff has not offered evidence to support this claim. Defs.' Post-trial Mem. 12-14 [#77].

A Lanham Act claim may be brought against any person who, "in connection with any goods or services" uses "in commerce" any:

> false or misleading description of fact, or false or misleading representation of fact, which…in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(B). To succeed on a Lanham Act false advertising claim a plaintiff must show:

> (1) a false or misleading description of fact or representation of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant placed the false or misleading

---

[12] The court does not reach Defendants' defense that the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice did not occur "primarily and substantially within the [C]ommonwealth." M.G.L. c. 93A § 11.

statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false or misleading statement, either by direct diversion of sales from itself to defendant or by a lessening of goodwill associated with its products.

Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 n.6 (1st Cir. 2000); see also Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002).

Here, while Plaintiff has shown that Defendants' statements about the manner and consequence of the Prior Lawsuit's resolution were false,[13] Plaintiff has not made a substantial showing that it has been or is likely to be injured by those statements.[14] And, while Plaintiff has established that the Opinion Letter was disparaging such that its publication was actionable as a breach of contract, Plaintiff did not litigate the truth or falsity of the Opinion Letter itself at trial. Moreover, Plaintiff has provided no evidence of how consumers have actually reacted[15] to the Letter beyond Snowden's testimony that some unspecified number of people have called to ask,

---

[13] Literal falsity carries with it "a presumption of consumer deception." Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 314 (1st Cir. 2002). However, the court notes that Plaintiff has made no showing as to how these statements actually deceived or had the tendency to deceive a substantial segment of Defendants' audience as to Cognitive Edge's SenseMaker product.

[14] Snowden testified only that, generally, the collective effect of the statements made on the Spryng.io website has been "huge market confusion" that has created "a considerable goodwill issue" and is causing Plaintiff to "los[e] credibility." Tr. 42-43. Plaintiff contends it has been unable to respond to inquiries while remaining within the bounds of the Settlement Agreement. See Tr. 43.

[15] Where an advertisement is not literally false, the plaintiff must additionally demonstrate "that the advertisement, though explicitly true, nonetheless conveys a misleading message to the viewing public. To satisfy its burden, the plaintiff must show how consumers have actually reacted to the challenged advertisement rather than merely demonstrating how they could have reacted." Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 (1st Cir. 2000) (internal citations omitted). "Usually consumer deception is demonstrated through surveys, which establish that consumers were misled by the alleged misrepresentations." Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 313-14 (1st Cir. 2002).

with regard to the Spryng.io website as a whole, "'What's your answer to this?'" Tr. 43. In sum, the court finds that the Plaintiff has not proven a claim under the Lanham Act claim.

E. <u>Claim Against Ajay Reddy and Jack Speranza</u>

Although Plaintiff's <u>Amended Complaint</u> [#26] did not name Ajay Reddy or Jack Speranza as defendants, Plaintiff now contends that "Cognitive Edge's Trial Brief provided notice to Defendants that Cognitive Edge, at trial, would seek to hold Ajay Reddy and Jack Speranza personally liable for any attorneys' fees award should Cognitive Edge prevail" and that Defendants made no objection the issue being tried. Pl.'s Post-trial Mem. ¶¶ 141-142 [#76].

However, "[a] judgment cannot be entered against one who is not a party to the case." <u>Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co., Balfour Beatty Constr. v. Int'l Bhd. Of Elec. Workers Local 99</u>, 497 F.3d 83, 94 (1st Cir. 2007) (citing <u>Metro. Prop. & Cas. Ins. Co. v. Shan Trac, Inc.</u>, 324 F.3d 20, 25 (1st Cir. 2003)). As the Supreme Court has explained, "[i]t is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process. The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant." <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 110 (1969) (internal citations omitted); <u>see also</u> <u>Taylor v. Sturgell</u>, 553 U.S. 880, 893 (2008) (quoting <u>Hansberry v. Lee</u>, 311 U.S. 32, 40 (1940) for the "general rule" that "one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process"). Thus, "[w]hen judgment is entered against an entity never properly served as a party to the case, the judgment is 'void' within the meaning of Rule 60(b)(4)." <u>Shank/Balfour Beatty</u>, 497 F.3d at 94 (citing <u>M & K Welding, Inc. v. Leasing Partners, LLC</u>, 386 F.3d 361, 364–65 (1st Cir. 2004)).

Where Reddy and Speranza were not summoned to answer this lawsuit, they are not presently before the court, and no judgment can enter against them.

F. <u>Remedy for Breaches of Contract and the Duty of Good Fair and Fair Dealing</u>

Defendants contend that "[t]he plaintiff has offered no evidence to suggest which, if any, of the defendants should be responsible for any of the claims asserted by the plaintiff." Defs.' Post-trial Mem. 23 [#77]. Defendants stipulated, however, that "Jack Speranza was the principal author on <u>Defendants' behalf</u>" of the Original Version and Revised Version of the webpages. <u>See</u> Joint Pretrial Mem. 7-8 [#71] (emphasis added). The only other communication at issue was the email sent by Ajay Reddy, who is CEO of each of the five companies. Accordingly, the court finds each of the five entities responsible for the breach of contract and breach of the covenant of good faith and fair dealing.

Cognitive Edge seeks a remedy of declaratory relief, permanent injunctive relief, and attorneys' fees and costs. Pl.'s Post-trial Mem. ¶ 58 and Request for Relief ¶¶ B, C [#76]. The court addresses these requests in turn.

1. *Declaratory Relief*

Plaintiff requests that the court declare that "by their public disclosure of the Settlement Agreement, Defendants have waived their right to enforce the first sentence of [] paragraph six of the Settlement Agreement ('This Memorandum of Understanding is Confidential Information for purposes of this agreement')." Pl.'s Post-trial Mem. Request for Relief ¶ B [#76]. As noted above, the court found that Defendants' disclosure of the Settlement Agreement, which lasted less than 45 minutes, caused no damages and was not actionable. Accordingly, the court does not base relief on this disclosure.

However, the Settlement Agreement is now a public document, where the parties agreed

to its unsealing and the court placed it on the public docket, the trial in this matter relating to the Settlement Agreement was public, and this Findings of Fact and Conclusions of Law discussing the Settlement Agreement is a public document. As the Settlement Agreement is now public, the contract's restrictions on disclosure of the Settlement Agreement are no longer be enforceable by either side.

### 2. *Injunctive Relief*

Plaintiff's Amended Complaint [#26] lists a generic request for "a permanent injunction" in the Prayer for Relief. Id. at 12. In its post-trial Proposed Findings of Facts and Conclusions of Law [#76], Plaintiff elaborates, asking the court: to order specific performance of the Settlement Agreement; "to make permanent the preliminary injunction the Court entered in this case"[16]; and to order Defendants to issue a retraction of the false and disparaging statements (specifying the language to be used, and directing the retraction "to the persons to whom Defendant[s] sent their marketing communications"); Pl.'s Post-trial Mem. ¶ 58, Request for Relief ¶ C [#76].

Plaintiff argues that "[a] permanent injunction is appropriate if the Court determines there

---

[16] The Preliminary Injunction [#31] orders that Defendants:

> 1. shall remove all information from Defendants' website or websites that refers to Plaintiff, or Plaintiff's products, property, employees or business, within twenty-four (24) hours of issuance of this Preliminary Injunction;

> 2. shall not disclose the terms and conditions of the Memorandum of Understanding entered into in Code Genesys, LLC v. Cognitive Edge PTE LTD, 18-cv-12409, or the substance of any settlement discussions preceding the Memorandum of Understanding, except as may be required by applicable law or as otherwise agreed to, in advance and in writing, by Plaintiff, except to disclose that "the parties have reached an agreement that resolves the parties' lawsuit"; and

> 3. shall undertake to refrain from defaming or disparaging Plaintiff, its products, services, finances, financial condition, capabilities, or other aspects of its business, or any former or existing employees, managers, directors, officers, or agents of or parties contracting with Plaintiff, in any medium and by any method to any person or entity through the pendency of this action.

is a reasonable likelihood that the defendant will violate the laws again in the future." Pl.'s Tr. Br. 4 [#72] (quoting United States SEC v. Johnston, 368 F. Supp. 3d 247, 255 (D. Mass. 2019)); see also id. at 5 ("Courts may order retractions when a statement is likely to be republished or finding that its harmful effects may persist" (citing Bose Corp. v. Consumers Union, 529 F. Supp. 357, 359 (D. Mass. 1981))). Plaintiff contends further that in seeking to convert a preliminary injunction into a permanent injunction, it must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction." Id. at 5 (quoting CrossFit, Inc. v. Mustapha, 2016 U.S. Dist. LEXIS 17062 at *13 (D. Mass. Feb. 11, 2016)).

Plaintiff has not met the standard it has set out. Although Plaintiff demonstrated Defendants' disregard of their contractual obligations immediately following settlement of the Prior Lawsuit, Plaintiff has not established a reasonable likelihood of Defendants' further breach, particularly where the first breach has resulted in significant litigation and a judgment against them. Plaintiff also has not established an "irreparable injury" where the Settlement Agreement is no longer confidential and Plaintiff now has this court's Findings of Fact and Conclusions of Law to correct the record of what occurred in the Prior Lawsuit. Finally, to the extent that Plaintiff seeks this court's order limiting speech or directing retractions beyond that agreed to by the parties in their Settlement Agreement, any such injunction would amount to an impermissible prior restraint on speech. See Sindi v. El-Moslimany, 896 F.3d 1, 31 (1st Cir. 2018). Accordingly, the request for a permanent injunction is denied.

*3. Costs and Fees*

Plaintiff also seeks its "attorneys' fees and costs per the Settlement Agreement." Pl.'s Post-trial Mem. ¶ 58 [#76]. Paragraph 10 of the Settlement Agreement provides that "the prevailing party" in any proceeding to enforce the terms of the Settlement Agreement "shall be entitled to recover costs, including reasonable attorneys' fees, incurred thereby." Tr. Exh. 1. The court finds that Plaintiff is the prevailing party on the breach of contract claim and is entitled under the Settlement Agreement to recover costs, including reasonable attorneys' fees, incurred thereby. The court also finds that Plaintiff's legal fees incurred in contacting Defendants' counsel and having the original website modified and in obtaining the temporary restraining order and preliminary injunction were reasonable post-breach expenditures made in mitigating the breach and are awarded as damages.

At trial, Cognitive Edge established that it incurred legal fees of $133,792.92 in this matter through June 30, 2020. Tr. 45; Tr. Exh. 21; Tr. Exh. 22. "Attorneys' fees can be either an element of damages to be proven at trial or a collateral matter to be determined following adjudication of the relevant claims." Pride Hyundai, Inc. v. Chrysler Fin. Co., LLC, 355 F.Supp.2d 600, 602 (D.R.I. 2005) (internal citation omitted). In making this distinction, "courts have differentiated between claims for attorney's fees based on 'prevailing party' contractual provisions," which are considered collateral and may be sought pursuant to a Rule 54(d)(2) motion, and claims for attorney's fees based on breaches of contract, where "a party's claim for attorney's fees is analogous to contractual damages and should be proven at trial." Rockland Tr. Co. v. Computer Associated Int'l, Inc., No. 95-11683-DPW, 2008 WL 3824791 at *5-6 (D. Mass. Aug. 1, 2008).

> [T]he distinction between a claim for attorney's fees based on a prevailing party provision and attorney's fees based on a breach of contract is said to turn on the

condition precedent to recovery. When a party seeks attorney's fees pursuant to a prevailing party provision, the condition precedent to recovery is the successful litigation of a claim. Conversely, when a party seeks attorney's fees as a result of a breach the condition precedent to recovering legal costs is a breach of contract by [a party].

Id. at *6 (internal quotations and citations omitted).

Here, the court has determined that those fees incurred through November 7, 2019, when the preliminary injunction was entered, were the result of the breach of the non-disparagement provision of the contract. The court determines further that Plaintiff is also entitled to attorney's fees as the prevailing party where it has now successfully prevailed on the breach of contract claim. While Defendants disputed that they breached the Settlement Agreement, they do not dispute that the attorney's fees of $133,792.92 proven at trial should be awarded on the court's finding that Plaintiff is the prevailing party on the breach of contract claim. Accordingly, the court awards fees of $133,792.92.

Plaintiff also "asks permission to submit its invoices for trial preparation, the trial and the preparation of these Proposed Findings of Fact and Conclusions of Law." Pl.'s Post-trial Mem. Relief Requested ¶ D [#76]. Under Fed. R. Civ. P. 54(d)(2), a claim for attorney's fees shall be made by motion, "unless the substantive law requires those fees to be proved at trial as an element of damages." As Plaintiff was not required to seek these additional fees as an element of damages, and instead seeks fees incurred after June 30, 2020, as the prevailing party on the breach of contract claim, Plaintiff may do so in a Rule 54(d)(2) motion.

IV.   Conclusion

For the foregoing reasons, the court finds in favor of Plaintiff on its claims for Breach of Contract (Count 1) and Breach of the Covenant of Good Faith and Fair Dealing (Count 2) of the

Amended Complaint [#26] and against Plaintiff on its remaining claims. The court awards

Plaintiff $133,792.92 in damages and fees.

IT IS SO ORDERED.

Date: January 19, 2021                                    /s/ Indira Talwani
                                                          United States District Judge